Reyes v City of New York
2026 NY Slip Op 03914
June 23, 2026
Court of Appeals
Rivera, J.
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

SeanPaul Reyes, Respondent,
v
City of New York, Appellant.

Decided on June 23, 2026
No. 59

Chase Henry Mechanick, for appellant.
Andrew Case, for respondent.
New York City Bar Association, New York Civil Liberties Union, The Legal Aid Society, amici curiae.

Rivera, J.

[*1]
In response to a certified question from the United States Court of Appeals for the Second Circuit, we clarify that the New York State and City laws that codified a private right to record police activities do not apply inside a police stationhouse, including its publicly accessible lobby.
I.
In 2020, the New York Legislature and New York City Council each enacted their own law recognizing a private right to record police activity referred to by the parties as the Right to Record Acts (RTRAs). The State statute, Civil Rights Law § 79-p (SRTRA), provides, in relevant part:
"A person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement activities, provided, however, that a person in custody or under arrest does not, by that status alone, forfeit the right to have any such recordings, property and equipment maintained and returned to him or her. Nothing in this subdivision shall be construed to permit a person to engage in actions that physically interfere with law enforcement [*2]activity or otherwise constitute a crime defined in the penal law involving obstructing governmental administration" (Civil Rights Law § 79-p [2]).
The City's law, Administrative Code § 14-189 (CRTRA), similarly provides, in relevant part:
"A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording. Nothing in this chapter shall be construed to permit a person to engage in actions that physically interfere with an official and lawful police function, or to prevent the seizure of any property or instruments used in a recording of police activities where the seizure is otherwise authorized by law, or to prohibit any officer from enforcing any other provision of law" (Administrative Code of City of NY § 14-189 [b]).
The RTRAs define a covered police activity as "any activity by an officer acting under the color of law" (Civil Rights Law § 79-p [1] [a], [b]; Administrative Code § 14-189 [a]), and create a private right of action for an officer's unlawful interference with the right to record (Civil Rights Law § 79-p [3] [a]; Administrative Code § 14-189 [c]). The rights recognized under the RTRAs are "in addition to all rights, procedures, and remedies available under the United States [C]onstitution" (Civil Rights Law § 79-p [4]); Administrative Code § 14-189 [d]). While the RTRAs' texts are broad in scope, the laws do not specify where recording of law enforcement may take place.
II.
Plaintiff SeanPaul Reyes, a self-described independent journalist, records his encounters with public officials and posts the videos to several online social media platforms. On one occasion, plaintiff went to the 61st Precinct of the New York Police Department (NYPD) in Brooklyn in response to a tip that the NYPD was arresting people for recording in the precinct lobby. A few minutes after plaintiff entered the publicly accessible lobby and began recording, an NYPD officer approached, directed him to a sign in the lobby setting forth the NYPD's policy prohibiting video recording inside police facilities (the Trespass Policy), and told him to stop recording or leave. After plaintiff ignored several additional warnings, officers arrested him and held him for approximately six hours. The police then charged him with trespass under Penal Law § 140.05 and released him on a desk appearance ticket. The District Attorney's office subsequently declined to prosecute and the charge was dismissed.FN1
Plaintiff then commenced the underlying action against the City of New York in the United States District Court for the Southern District of New York, asserting claims based on violations of the First Amendment and the RTRAs (see 2023 WL 7212192 [SD NY, Nov. 2, 2023, No. 23-CV-6369 (JGLC)]). Plaintiff moved for a preliminary injunction to prohibit application of the Trespass Policy and to require removal of all precinct signage announcing the policy. The District Court granted the motion after a hearing, enjoining enforcement of the Trespass Policy in precinct lobbies to the extent inconsistent with the RTRAs (2023 WL 7212192, *13). The court concluded that plaintiff was unlikely to succeed on his First Amendment claim under a public forum analysis but likely to succeed on both RTRA claims, holding that the RTRAs "go beyond the protections of the First Amendment" and contained no carve-out for precinct lobbies (id. at *11 [internal quotation marks omitted]). The City appealed and the Second Circuit partially stayed the injunction, except as applied to plaintiff individually, pending disposition of the appeal (141 F4th 55, 63 [2d Cir 2025]).FN2
The Second Circuit concluded that resolution of the RTRA claims was determinative of the appeal, that there was no case from our Court interpreting the RTRAs, and that it could not predict how we would construe the RTRAs as they relate to the issue of recording within a police precinct lobby (id. at 59). The Second Circuit thus certified for our consideration the following question:
"Does either N.Y. Civ. Rights Law § 79-p or N.Y.C. Admin. Code § 14-189 afford individuals such as plaintiff Reyes the right to video record law enforcement activities inside public facilities—specifically, inside the publicly accessible lobbies of police stationhouses—notwithstanding a New York City Police Department policy forbidding any video recording inside its facilities?" (id. at 76).
The Court invited us to reformulate or expand the certified question as we deem appropriate (id.). We accepted the question (44 NY3d 961 [2025]), and we now exercise our inherent authority to limit the inquiry to address the narrow issue presented by plaintiff's claims (see Rules of Ct of Appeals [22 NYCRR] § 500.27 [d]). We therefore do not opine as to the full scope of the RTRAs' application or any other places where the RTRAs may apply. We reformulate the question as follows:
"Does either N.Y. Civil Rights Law § 79-p or Administrative Code of the City of New York §§ 14-189 afford individuals such as plaintiff Reyes the right to video record law enforcement activities inside the publicly accessible lobbies of police stationhouses?"
We answer that question in the negative.
III.
A.
On a question of statutory interpretation, "[o]ur primary consideration is to ascertain and give effect to the intention" of the Legislature, and "the clearest indicator of legislative intent is the statutory text" (Matter of New York Civ. Liberties Union v City of Rochester, 43 NY3d 543, 549 [2025] [citations and internal quotation marks omitted]). However, "a literal reading of a statute should, where possible, be avoided if it produces an absurd or unjust result" (Milbrandt v A.P. Green Refractories Co., 79 NY2d 26, 36 [1992]). "[W]here the [statute's] language is ambiguous, we may examine the statute's legislative history" (People v Ballman, 15 NY3d 68, 72 [2010] [citations and internal quotation marks omitted]), and ensure that our reading of the statutory text affords "due consideration . . . to the statutory purpose and history, including the objectives the legislature sought to achieve through [the statute's] enactment" (New York Civ. Liberties Union, 43 NY3d at 549; see also McKinney's Cons Laws of NY, Statutes § 92, Comment).
The RTRAs do not impose any limitation on where the right to record police activity may be exercised, providing the who, what, and when but not the where. This silence renders both RTRAs ambiguous as to whether the right to record applies in police stationhouses, including publicly accessible precinct lobbies. Plaintiff's reliance on the negative implication of expressio unius est exclusio alterius, does not resolve this ambiguity because the language he characterizes as "exceptions" only clarifies the scope of the right and not where that right may be exercised. For example, the RTRAs exclude from the right "actions that physically interfere with" lawful police activity (see Civil Rights Law § 79-p [2]; Administrative Code § 14-189 [b]). Such interference could occur on the street corner or arguably within a stationhouse. The negative implication of the expressio unius canon does not resolve the statutory ambiguity.
Thus, we turn to the legislative history of the RTRAs, which we conclude clarifies that neither the Legislature nor the City Council intended that the right apply in police stationhouses, including their publicly accessible lobbies.
B.
The RTRAs were enacted in response to a specific and recurring national phenomenon: "a widespread, continuing pattern of law enforcement officers ordering onlookers to cease video or audio recording of their official behavior and actions while in the line of duty" and reports of those who did not comply being "harassed, detained, and even arrested by the police" (Senate Introducer's Mem in Support, of 2019 NY Senate Bill S3253, enacted as L 2020, ch 100 at 2). The Speaker of the City Council of New York noted that while "[p]olice brutality is nothing new, . . . cell phones are[,]" and the "fact that so many instances of brutality and people losing their lives and being killed have been filmed has helped the world see the depth of this long-standing problem and we must make sure that the right to film police activities is codified into law" (Council of City of NY, Stated Meeting, Tr of Minutes, Jun. 18, 2020, at 23-24).
The Legislature drew on specific events as the impetus for the bill. For example, in 2013, Ramsey Orta recorded NYPD Officer Daniel Pantaleo placing Eric Garner in a fatal chokehold on a Staten Island sidewalk; that footage, widely circulated on social media, triggered national outrage, an administrative proceeding against Pantaleo, and ultimately the City Council's ban on chokeholds (Assembly Debate on 2020 Senate-Assembly Bill S3253-A, A1360-A, Jun. 8, 2020 [hereinafter 2020 Assemb Tr], at 128). On May 25, 2020, shortly before enactment of the RTRAs, a seventeen-year-old recorded the murder of George Floyd on a Minneapolis sidewalk, an act that one former Assemblymember described on the floor of the Legislature as the reason for the members gathering in session (id.). The City Council discussed these cases, but also noted other stories, including that of Rayne Valentine, a Brooklyn hospital employee, who was violently beaten by officers in retaliation for attempting to record officers' interaction with protesters (Council of City of NY, Comm on Pub Safety, Tr of Minutes, Jun. 9, 2020, at 34—35). In each case, the person recording was standing in a public space, not a police stationhouse, witnessing police activity with a camera. These types of public recordings of police officers' violent altercations with individuals on the street and of officers' attempts to seize and suppress the recordings were posted on social media, leading to nationwide protests calling for racial justice and police accountability.FN3 Against this national background, the Legislature and City Council enacted the RTRAs to protect New Yorkers' "right to record a police officer without the fear of repercussions" (2020 City Council Tr at 35]).
The SRTRA's sponsor memorandum states the legislation's purpose is "to unambiguously affirm, by statutory enactment, the right of New Yorkers to record, with expressed exceptions, the actions of persons acting under the color of law" (Senate Introducer's Mem in Support, Bill Jacket, L 2020, ch 100, at 5). The "justification" section of that same memorandum identifies reasoning from four federal circuits as the legal foundation for the legislation—the First, Seventh, Ninth, and Eleventh—each of which had "issued clear and consistent opinions finding that the First Amendment of the United States Constitution openly confers and protects the right of ordinary civilians to record police activity" (Senate Introducer's Mem in Support, Bill Jacket, L 2020, ch 100, at 5). Each of the four federal circuit court decisions mentioned in the sponsor's memorandum recognized the right to record in the context of outdoor public spaces. None of these cases involved the right to record in a police stationhouse.FN4
Statements made during floor debates further confirm that the SRTRAs' right to record does not apply to police stationhouses, including publicly accessible precinct lobbies. Assemblymembers sought to address "the great need [of] New Yorkers to be assured that they, indeed, have a right to monitor and record police arrests and other police activity occurring in public spaces on our public streets" (2020 Assemb Tr at 120; see also id. at 125-126), asserting that "people on the streets" need protection when recording "officers misbehaving" (id. at 103), especially as "social media" reports that witnesses to police brutality were being subject to "harassment and . . . false arrests" proliferated. The legislators underscored that "the need to codify [the] right to monitor [was] paramount" (id. at 120). The debates focus on the right to record in public areas as the historical incidents of police misconduct. The CRTRA's legislative history similarly does not focus on police stationhouses or precincts lobbies as the site of police activity subject to the right to record. The committee report issued upon the CRTRA's passage in June 2020 discussed the murders of George Floyd and Eric Garner in the context of establishing the right to record police activity, and referenced instances of retaliation for recording (Rep of NY City Council Justice Div, Comm on Public Safety, June 9, 2020 at 4-7).FN5
Hearings related to an earlier version of the bill focused on officer interference with private recordings at sidewalk encounters, protests, and stops in public spaces (Council of City of NY, Comm on Health, Comm on Public Safety, Tr of Minutes, Dec. 14, 2017, at 120, 173, 183; see also Council of City of NY, Stated Meeting, Tr of Minutes, Mar. 7, 2018, at 42). The City Council Speaker explained that the act arose from the direct link between viral recordings of police misconduct, the resulting accountability movement, and legislative reform.
The debates in the City Council focused on protecting the right to record police misconduct by the public, without any mention of police stationhouses as a site of unchecked and unrecorded police misbehavior. In testimony before the Council on the day of the CRTRA's passage, the NYPD's First Deputy Commissioner stated that the bill's "substance" was already reflected "in our Patrol Guide"—the same Patrol Guide that sets forth the Trespass Policy that prohibits recording in precinct lobbies (id. at 63). In fact, the Council passed the bill without modification, two years after the NYPD publicly announced its Trespass Policy, to much coverage by the press, and after the Deputy Commissioner opined during the hearings that the CRTRA did not affect the Trespass Policy. Thus, notwithstanding defendant's contention that the RTRAs extended the right to record to police precincts, the NYPD's well-known Trespass Policy had already been in effect for years at the time the laws were passed, yet the floor debates never reference the Trespass Policy, police stationhouses, or publicly accessible precinct lobbies. In short, the Council enacted the CRTRA with full knowledge of the Trespass Policy and did nothing to abrogate it.
The legislative history, read as a whole, establishes that the RTRAs were not enacted to ensure the right to record in police stationhouses and precinct lobbies. Police stationhouses were not the topic of legislative discussion at all.
IV.
Plaintiff's interpretation of the RTRAs leads to absurd results. First, plaintiff's contention that the RTRAs apply to precinct lobbies implicates significant privacy concerns.FN6 As the District Court found, the City has "shown an intent to ensure that victims of crimes receive emergency social and medical services as soon as possible and enjoy a 'freedom from intimidation, threats or harassment' " (2023 WL 7212192, *8), quoting Executive Law § 641 [providing objectives of "fair treatment standards" for crime victims]). Permitting members of the public to record [*3]events and individuals in precinct lobbies would violate the privacy interests of crime victims, witnesses, confidential informants, and undercover officers. Indeed, when victims of sensitive crimes like human trafficking, domestic violence, or sexual assault enter a stationhouse lobby to report the crime officers—as a matter of policy—turn off their body worn cameras (2023 WL 7212192, *8-9). If anyone could enter the precinct lobby and begin recording, victims (and others) would be disincentivized from reporting crimes and providing information crucial to law enforcement. The danger is real; as the Legislature and City Council understood, anyone with a cellular telephone can record a private moment or conversation, then instantly post the recording, or livestream their observations, leading to instantaneous worldwide dissemination (see supra at n 3).
Plaintiff asserts that to protect privacy the NYPD has adopted several mitigating policies and procedures to protect individuals' privacy, including private facilities for certain victims and witnesses. Beyond the absence of any such information in the record, the SRTRA applies statewide and many police stationhouses outside New York City have fewer resources than the NYPD and may not be able to provide similar privacy protections.FN7
Second, video recording and dissemination of individual stationhouses located throughout the State could reveal confidential investigative information and jeopardize officers' strategic responses to criminal activity (see 2023 WL 7212192, *8-9). Surely, the State Legislature and City Council did not intend to invade personal privacy interests and jeopardize law enforcement and public safety by extending video recording to publicly accessible precinct lobbies, at least not without expressly stating so. Not only are such declarations missing from the RTRAs, both statutes expressly disavow any intention of permitting activities that "physically interfere" with "law enforcement activity" (Civil Rights Law § 79-p [2]) or "an official and lawful police function" (Administrative Code § 14-189 [b]). Accordingly, the certified question, as reformulated, should be answered in the negative.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question, as reformulated, answered in the negative. Opinion by Judge Rivera. Chief Judge Wilson and Judges Garcia, Singas, Cannataro, Troutman and Halligan concur.
Decided June 23, 2026

Footnotes

Footnote 1
Two months later, in June 2023, plaintiff was again arrested for attempting to record inside another NYPD precinct lobby. The Criminal Court of the City of New York initially dismissed the trespass and governmental interference charges against plaintiff arising from that incident, but the Appellate Term reversed the criminal court's dismissal of the trespass count (88 Misc 3d 134[A], 2026 NY Slip Op 50675[U] [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2026]). The events relating to the June 2023 arrest, however, do not form the basis of plaintiff's claims before this Court.

Footnote 2
In a subsequent decision denying, in part, defendant's motion to dismiss, the District Court concluded the forum analysis was not appropriate and, instead, applied intermediate scrutiny to conclude that plaintiff had stated a claim under the First Amendment (see 2024 WL 4354877 [SD NY Sept. 30, 2024, No. 23-CV-6369 (JGLC)]) The First Amendment issue is not before us. In a separate decision, the District Court dismissed petitioner's claim that the Trespass Policy fails to comply with the City Administrative Procedure Act's ("CAPA") rulemaking procedure (see 2024 WL 4354877, *12 [SD NY, Sept. 30, 2024, No. 23-CV-6369 (JGLC)]; see also New York City Charter §§ 1041-1047). The Second Circuit concluded that the CAPA claim was not at issue on the City's appeal from the preliminary injunction and refused plaintiff's requests to affirm based on the alleged CAPA violation (141 F4th at 62 & n 8). Given this procedural posture, we decline plaintiff's invitation to consider the CAPA claim on this certified question.

Footnote 3
The Legislature was keenly aware of the transformative and widespread use of camera-equipped smartphones and the augmenting role of digital social networks in the movement for increased government transparency and police accountability (see Senate Introducer's Mem in Support, of 2019 NY Senate Bill S3253, enacted as L 2020, ch 100 at 2 [citing this "phenomenon" in justification section of Senate bill]). As noted by the Senate Sponsor of the SRTRA "rights of uninvolved onlookers to record law enforcement activity provide critical checks and balances on the tremendous power of the police." (id.).

Footnote 4
The First Circuit in Glik v Cunniffe, upheld the right to record at Boston Common, a public park in downtown Boston, subject to reasonable time, place, and manner restrictions (655 F3d 78, 82—84 [1st Cir 2011]). The Seventh Circuit in American Civil Liberties Union of Illinois v Alvarez, reaffirmed that the right applied to recording in "traditional public fora like streets, sidewalks, plazas, parks, and other open public spaces." (679 F3d 583, 598 n 7 [7th Cir 2012]). The Ninth Circuit in Fordyce v City of Seattle, recognized plaintiff's "First Amendment right to film matters of public interest" on "the streets of Seattle" (55 F3d 436, 439 [9th Cir 1995]). The Eleventh Circuit in Smith v City of Cumming, protected "the right to gather information about what public officials do on public property" (212 F3d 1332, 1333 [11th Cir 2000]).

Footnote 5
The CRTRA enacted by the City Council in 2020 was substantively identical to the bill introduced in 2016.

Footnote 6
Our reformulated question makes it unnecessary to consider the City's claim that the plaintiff's interpretation would violate the privacy of individuals present in the publicly accessible areas of hospitals and educational institutions. Nor do we need to consider whether plaintiff's reading would place the RTRAs in conflict with other state and federal laws.

Footnote 7
The resource disparity between the NYPD and most American police agencies is stark (see Bureau of Justice Statistics, U.S. Dept of Justice, Local Police Departments Personnel, 2020, at 1 [NCJ 305187, Nov. 2022], https://bjs.ojp.gov/library/publications/local-police-departments-personnel-2020 [finding that 46% of all local police departments in the United States employed fewer than ten full-time sworn officers]).